**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| TESORO REFINING & MARKETING COMPANY LLC and MARATHON PETROLEUM COMPANY LP,<br><br>Plaintiffs,<br><br>v.<br><br>AK, INC.; REBEL LAND AND DEVELOPMENT, LLC (AND EACH DESIGNATED SERIES THEREOF); SAMMER ANABI; AND RAWA (RENE) ANABI,<br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Case No. 5:25-CV-01787-JKP** |

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs Tesoro Refining & Marketing Company LLC ("Tesoro") and Marathon Petroleum Company LP ("Marathon," together with Tesoro, "Plaintiffs"), file their First Amended Complaint against Defendants, AK, Inc., Rebel Land and Development, LLC (and each Designated Series thereof), Sammer Anabi, and Rawa (Rene) Anabi (collectively, "Defendants"), and state as follows:

## I. SUMMARY OF THE DISPUTE

1. This case arises from Defendants' refusal to honor a contractually mandated extension under the Multi-Site Throughput Agreement (the "Agreement") dated December 15, 2015. The Agreement unambiguously provides an option (the "Option") for a two-year extension (the "Extension") upon written notice delivered at least twelve months before expiration (the "Extension Notice"). Plaintiffs timely delivered the Extension Notice. The Agreement imposes no

other condition. Defendants admit they received the Extension Notice more than a year before it was due. After receiving the Extension Notice, which Lisa Wilson was actually authorized by both Tesoro and Marathon to provide, Defendants confirmed in writing—multiple times—the validity of the Extension and expressed enthusiasm about the extended term of the Agreement ("Extended Term").

2. Yet, Defendants ignored and repudiated the extended Agreement, unilaterally stripped Plaintiffs' bargained-for branding from each of the fifty-five (55) retail motor fuel stations in Las Vegas, Nevada subject to the Agreement, and terminated Plaintiffs' supply operations at those stations—all while marketing Plaintiffs' contractual rights to third parties.

3. Defendants contend they were unaware that the Option under the Agreement was exercised and that the Extension Notice was invalid because it was sent using Marathon letterhead and no notice of assignment had been provided. This is pretext. The Agreement does not contain the prerequisites to exercise the Option that Defendants now seek to impose. Defendants have corresponded with Marathon employees—using Marathon titles, email addresses, and branding on official correspondence, including letterhead and signature blocks—since 2018 and accepted payments due under the Agreement from Marathon. Furthermore, the merger of Marathon Petroleum Corporation and Andeavor (and its subsidiaries, including Tesoro) was highly publicized. Defendants understood that Marathon had authority to act under the Agreement, based on multiple objective indications, along with Marathon's express actions. Only after it no longer served their agenda did Defendants then contend they were unaware. Defendants' contrived argument also ignores the Agreement's express provisions, which simply require "written notice" to extend the Agreement—provided via the Extension Notice that Defendants admit they received. Furthermore, the Agreement also expressly permits assignment without consent or a separate

notice of assignment. In addition, the assignment pretext is moot, as Lisa Wilson was duly authorized by both Tesoro and Marathon to send the Extension Notice. Defendants' repudiation of the Agreement, using after-the-fact justifications as a basis, was a calculated tactic to abandon their contractual obligations. Defendants' repudiation was economically motivated: they sought to renegotiate more favorable terms or transition to a competing fuel supplier to extract higher pricing, and their purported objections to the Extension Notice were pretextual.

## II. JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between Plaintiffs and Defendants. Plaintiffs are citizens of Delaware and Ohio, and Defendants are citizens of Alaska, Nevada, and California.

5. Venue is proper in this District, because this action arises from a contract that expressly provides for exclusive jurisdiction in courts located in San Antonio, Texas. Section 26.D of the Agreement states that "[e]ach party consents to the exclusive jurisdiction of any court of competent jurisdiction located in San Antonio, Texas." This contractual forum-selection clause satisfies the venue requirements of 28 U.S.C. § 1391(b), as a substantial part of the events giving rise to the claim occurred in Bexar County and the parties agreed to litigate in this forum.

## III. PARTIES

6. Tesoro is a limited liability company formed under the laws and protections of the State of Delaware, with its principal place of business in the State of Ohio. Tesoro's parent company, and sole member, is Western Refining Southwest LLC ("Western"). Western's sole member is Marathon.

7. Marathon is a limited partnership formed under the laws and protections of the State of Delaware, with its principal place of business located in the State of Ohio. Marathon's partners

are the following: (a) MPC Investment LLC (General Partner), (b) Marathon Petroleum Corporation (Limited Partner), and (c) Giant Industries, Inc. (Limited Partner).

8. Marathon Petroleum Corporation ("MPC") is a corporation formed under the laws and protections of the State of Delaware with its principal place of business located in the State of Ohio.

9. MPC Investment LLC's sole member is MPC.

10. Giant Industries, Inc. is a corporation formed under the laws and protections of the State of Delaware with its principal place of business located in the State of Ohio.

11. Defendant AK, Inc. ("AK" or as defined in the Agreement, "Operator") is an Alaska corporation with its principal place of business in Upland, California. AK has answered and appeared in this case.

12. Defendant Rebel Land and Development, LLC (and each Designated Series thereof) ("Rebel" or as defined in the Agreement, "Landlords") is a Nevada limited liability company with an office at 1450 North Benson Avenue, Upland, California 91786. Rebel's sole member is the Claremont Legacy Trust. The Claremont Legacy Trust's sole members are Defendants Sammer Anabi and Rawa (Rene) Anabi. Rebel has answered and appeared in this case.

13. Defendant Sammer Anabi is a principal referenced in, and who executed, the Agreement and the Continuing Guaranty (defined below) and is domiciled in California. Mr. Anabi has answered and appeared in this case.

14. Defendant Rawa (Rene) Anabi is a principal referenced in, and who executed, the Agreement and is domiciled in California. Mrs. Anabi has answered and appeared in this case.

## IV. FACTUAL BACKGROUND

15. This action arises from a dispute concerning the parties' rights and obligations under the Agreement, effective December 15, 2015, as amended, governing fuel supply, branding, and related operational arrangements at approximately fifty-five (55) retail motor fuel stations in Nevada ("Nevada Locations"). The Agreement, among Tesoro as the "Company," Tesoro Northstore Company ("Northstore"), AK, and Rebel, was executed by Sammer Anabi and Rawa (Rene) Anabi. Under the Agreement and related documents, Tesoro supplied fuel products including Motor Fuel Products (as defined in the Agreement) and held brand and exclusivity rights at the Nevada Locations, while AK and Rebel received defined throughput compensation and other benefits, including Northstore providing rent reductions for rents due subsequent to an associated Alaska lease arrangement.

16. Plaintiffs invested significant amounts in the initial branding of the Nevada Locations and in the upkeep of the branding throughout the Agreement, such as signage, logos, and advertising, with the reasonable expectation that the investment in branding would benefit Plaintiffs' brand presence and brand goodwill.

17. Pursuant to the Agreement, the "Commencement Date" is the first day of the month following the final changeover at the Nevada sites. The last changeover occurred on December 21, 2015, yielding a Commencement Date of January 1, 2016. Ex. A, Wilson Decl. Exs. A-1 at Pg. 2 § 2.G, A-5 at Pg. 2.

18. The initial Term thus expires on January 31, 2026, "the last day of the 120th month after the Commencement Date," unless a contractual option to extend the Term for an additional two years was timely exercised. Ex. A, Wilson Decl. Ex. A-1 at Pg. 4 § 3. To exercise the extension, the Agreement simply requires written notice to be provided to the Operator, AK, at least twelve months before the Expiration Date. Ex. A, Wilson Decl. Ex. A-1 at Pg. 4 § 3

("Company may exercise its Option to extend by providing written notice to Operator no later than twelve (12) months prior to the Expiration Date").

19. On May 10, 2017, the parties executed a First Amendment to the Agreement, which updated various exhibits, fee schedules, and brand-related provisions while preserving the Agreement's fundamental structure and term mechanics. Ex. A, Wilson Decl. Ex. A-2.

20. On November 20, 2023, well more than twelve months before the January 31, 2026, Expiration Date and well before the January 31, 2025 deadline to do so, the Option was timely exercised. Lisa D. Wilson sent the Extension Notice pursuant to the notice provisions set forth in the Agreement. Ex. A, Wilson Decl. Ex. A-3.

> Re: Exercise of Option the Extend Multi-Site Throughput Agreement
>
> Dear Sam and Rene:
>
> Pursuant to Section 3 of the Multi-Site Throughput Agreement effective December 15, 2015, between Tesoro Refining & Marketing Company LLC (now Marathon Petroleum Company LP) and AK, Inc. and certain other parties (the "Agreement"), please take Notice that Company hereby elects to exercise the Option to extend the Term for an additional two (2) years. As a result, the Expiration Date of the Agreement is now the last day of the 144th month after the Commencement Date, as set forth in the Agreement.
>
> Sincerely,
>
> DocuSigned by:
> Lisa Wilson
> 3A14DC3D506D472...
> Lisa D. Wilson
> Vice-President, Clean Products Division West
> Marathon Petroleum Company LP

21. Ms. Wilson, an officer of Tesoro, was duly authorized by both Tesoro and Marathon to send the Extension Notice. Ex. A, Wilson Decl. Pg. 3, ¶ 6, Ex. A-3; Ex. B, Partee Decl. Pg. 1-2, ¶¶ 2–6. As an officer of Tesoro, Ms. Wilson was authorized to provide the Extension Notice concerning the exercise of the Option under the Agreement on behalf of Tesoro. Ex. A, Wilson Decl. Pg. 3, ¶ 6; Ex. B, Partee Decl. Pg. 2, ¶ 6. Ms. Wilson also had authority to send the Extension Notice on behalf of Marathon. Brian Partee, in his role as officer of MPC Investment

LLC, specifically authorized Ms. Wilson to send the Extension Notice. Ex. B, Partee Decl. Pg. 2, ¶ 6. MPC Investment LLC is the general partner of Marathon, and MPC Investment LLC, through its officers including Mr. Partee, is authorized to take and direct actions for Marathon. Ex. B, Partee Decl. Pg. 1-2, ¶¶ 2–3. Mr. Partee has been an officer of MPC Investment LLC at all relevant times, including November 20, 2023.

22. Following Plaintiffs' timely exercise of the Option, Defendants expressly acknowledged the validity of the Extension. For example, on January 8, 2024, Rawa (Rene) Anabi emailed stating: "We are excited about Marathon's extension of the [Agreement] and securing our operations of MSOs [third-party operated stations] in AK for the additional 2 years as this continues to support the model." Ex. A, Wilson Decl. Ex. A-8, Pg. 2.

**From:** Rene Anabi <ranabi@anabioil.com>
**Sent:** Monday, January 8, 2024 9:35 PM
**To:** Eseigbe, Victor E. <VEEseigbe@marathonpetroleum.com>
**Subject:** [EXTERNAL] Touching base

Hi Victor, happy new year. Hope you had a great vacation can't wait to hear all about it. We are excited about Marathons extension of the MST agreement and securing our operations of MSOs in Ak for the additional 2 years as this is continues to support the model. Let us know if you would like to come by this week for lunch to catch up.

Rene Anabi

23. Again in June 2024, Defendants confirmed "Marathon has exercised its options on the MST agreement which extends our arrangement in Las Vegas and Alaska for 2 years." Ex. A, Wilson Decl. Ex. A-8, Pg. 1.

**From:** Rene Anabi <ranabi@anabioil.com>
**Sent:** Monday, June 24, 2024 12:01 PM
**To:** Eseigbe, Victor E. <VEEseigbe@Marathonpetroleum.com>
**Cc:** Wilson, Lisa D. <lisadwilson@marathonpetroleum.com>
**Subject:** RE: [EXTERNAL] Touching base

Good morning Victor,

Hope all is well, Sam and I were having conversations over the weekend regarding some of our long term strategies. Of course, Marathon came up. Unfortunately, it reminded us that we are still waiting and have not heard back from you guys on a couple of very critical points. So, I am reaching out to you this morning and I need to get some answers from you.

First, Marathon has exercised its options on the MST agreement which extends our arrangement in Las Vegas and Alaska for 2 years. We were initially very pleased by this since we could remain in Alaska which, as you know, is very important to us and economics of this deal. We have further asked questions about the renewal in Alaska and have not received any answers. This should be an easy answer as the Alaska agreement automatically extends with the extension of the MST agreement and we just need confirmation that you have in fact secured this extension.

24. These written communications confirm Defendants understood and accepted that the Agreement was extended through the additional two-year term. Defendants did not raise any objection at that time; instead, they sought further discussions regarding expansion opportunities.

25. The Extension Notice thus extended the Agreement through January 31, 2028. Defendants did not raise an issue with this Extension Notice until almost two years later.

26. In October 2025, as the parties engaged in discussions concerning future supply arrangements beyond the Extended Term, it became apparent that Defendants were engaging with third-party brands about potential rebranding and supplying opportunities for the Nevada portfolio. Ex. A, Wilson Decl. Pg. 4, ¶ 9, Exs. A-4, A-5, A-7.

27. Plaintiffs responded to these overtures by expressing to the Operator that efforts to induce early termination or breach would be improper. Ex. A, Wilson Decl. A-6.

28. On October 28, 2025, counsel for Defendants questioned—for the first time—the validity of the exercise of the extension rights. On November 14, 2025, Defendants further asserted their position that the Extension Notice was ineffective. They contended that the Agreement would therefore expire on January 31, 2026. Ex. A, Wilson Decl. Ex. A-4.

29. Defendants contend the Extension Notice was invalid because Ms. Wilson sent it using Marathon letterhead and no notice of assignment had been provided.

30. Defendants had long been aware of the affiliation between Marathon and Tesoro. On October 1, 2018, MPC merged with Andeavor. This was publicly disclosed, including in correspondence with Defendants. Since then, Defendants have corresponded with Marathon employees for all matters relating to the Agreement, including payments issued by Marathon. Defendants have also accepted payments due under the Agreement from Marathon since that time. Ex. A, Wilson Decl. Exs. A-9, A-10, A-12.

31. Further, Defendants were informed of the Marathon and Andeavor transition in 2018. In one email, Defendants responded: “Thanks for letting us know. Let me know if you need anything during the transition.” Ex. A, Wilson Decl. Ex. A-11.

32. In subsequent correspondence, Plaintiffs reiterated that the November 20, 2023, Extension Notice expressly exercised the Option as “Company” under the Agreement, satisfied the timing requirement, and was sent to the Operator at the designated addresses set forth in the Agreement. Ex. A, Wilson Decl. Ex. A-5.

33. On November 24, 2025, Plaintiffs reiterated in correspondence that the Extension Notice tracked the Agreement’s defined terms and unambiguously invoked the Option, thereby extending the Agreement to January 31, 2028. Ex. A, Wilson Decl. Ex. A-6, Pg. 2.

34. The Agreement granted just a single option to extend the Term for an additional two (2) years, exercisable by written notice to Operator no later than twelve (12) months prior to the Expiration Date (Section 3). The Agreement’s “Notices” provision provides personal service, electronic mail, certified mail, regular mail, facsimile, or overnight trackable delivery and imposes no requirement for Tesoro letterhead or form. Ex. A, Wilson Decl. Ex. A-1 at Pg. 25 § 23.

35. The “Assignment by Company” clause allows Company, without Operator’s prior consent, to sell, transfer, encumber, or assign its interest, in whole or in part. Ex. A, Wilson Decl. Ex. A-1 at Pg. 21 § 17.B. The Agreement further provides: “This Agreement is binding upon and enforceable against the parties’ respective successors, permitted assignees, legal representatives, executors, administrators, heirs, and legatees.” Ex. A, Wilson Decl. Ex. A-1 at Pg. 27 § 26.F.

36. Despite the valid Extension, Defendants have marketed and solicited third-party negotiations concerning the locations covered by the Agreement. Ex. A, Wilson Decl. Pg. 4 ¶ 9. These actions contravene Plaintiffs’ contractual rights and threaten harm to Plaintiffs’ throughput rights, brand identifications, exclusivity, and the negotiated term under the Agreement.

37. Defendants Rawa (Rene) Anabi and Sammer Anabi, acting in their individual capacities and through entities they control, intentionally interfered with Plaintiffs' existing contractual rights under the Agreement and intentionally caused the other Defendants to breach the Agreement. Defendants Rawa (Rene) and Sammer Anabi caused the breaches of the Agreement after personally marketing and negotiating with contractual rights belonging to Plaintiffs for the Anabis’ personal gain.

38. On December 5, 2025, Defendants made clear in correspondence from their attorneys that they would terminate Plaintiffs’ rights in January 2026. Ex. A, Wilson Decl. Ex. A-7.

39. Plaintiffs continued to object to any disruption to Defendants’ performance under the Agreement, consistently reiterating that the Agreement was not terminated.

40. Beginning on Monday, May 4, 2026—after Defendants delivered purported notice on Friday, May 1, 2026—Defendants unilaterally removed Plaintiffs’ proprietary and bargained-for branding from the Nevada Locations over Plaintiffs’ repeated objections.

41. Defendants' "notice" was defective. Specifically, Defendants' May 1, 2026 notice satisfied none of the Agreement at Section 22's standards. Defendants have no termination right under Section 22 of the Agreement. Even if Defendants had rights under Section 22, no individual Motor Fuel Facility can exit the Agreement in under twenty (20) days from initial written notice and thirty (30) days' notice is required before any termination of the Agreement as a whole. Defendants' May 1, 2026 notice and subsequent unilateral de-branding beginning on May 4, 2026 violated Section 22 of the Agreement.

42. Additionally, the extensive logistics involved in de-branding the Nevada Locations, including but not limited to coordinating with several vendors handling the physical work of de-branding, cataloging and organizing the de-branding needed for fifty-five separate locations, and planning and producing extensive brand replacements, shows that Defendants' preparations for the de-branding began long before the May 1 notice, and the de-branding which began three days later was an unnecessary ambush to Plaintiffs. Plaintiffs incurred further damages due to Defendants' failure to notify Plaintiffs of the planned unilateral de-branding within a reasonable time. Defendants were aware that their "notice" on the Friday before the commencement of the unilateral de-branding on Monday would cause Plaintiffs additional harm and would prevent Plaintiffs from seeking relief before de-branding could begin. This pattern of last-minute notice continued throughout Defendants' pre-planned de-branding process, despite Defendants' knowledge that such delays in notice exacerbated the harm to Plaintiffs.

43. Plaintiffs again objected to the unilateral de-branding of the Nevada Locations and notified Defendants again that Defendants' de-branding of the Nevada Locations constituted a breach of the Agreement in a letter dated June 1, 2026.

44. Over Plaintiffs' objections, Defendants completed the unilateral de-branding of all Nevada Locations in August 2026.

45. Following the de-branding, Defendants continued to operate the Nevada Locations and sell Motor Fuel Products from those locations, and have contracted with another supplier, benefiting from the infrastructure, customer base, and brand recognition that Plaintiffs built and maintained during the Agreement's term, without compensating Plaintiffs for the value of those unfairly retained benefits.

46. Defendants have also retained Plaintiffs' Motor Fuel Products at the Nevada Locations without payment to Plaintiffs. Defendants have removed, transferred, sold or otherwise disposed of Plaintiffs' Motor Fuel Products without a prior written agreement on price and terms consistent with the Agreement, causing damages to Plaintiffs for the loss of Plaintiffs' products at the Nevada Locations, including Motor Fuel Products.

47. As a result of Defendants' breaches of the Agreement and Defendants' marketing and sale of Plaintiffs' contractual rights to others, Plaintiffs have incurred, and continue to incur, damages directly caused by Defendants' actions, including but not limited to lost profits due to the loss of significant operational and logistical commitments based on the Extended Term, including refinery planning, fuel supply allocations, pipeline, trucking, and other transportation, pipeline space, and inventory planning. The Nevada Locations were part of long-term business planning, such that Defendants' breach of the Agreement causes systemic harm to Plaintiffs. Specifically and without limiting the generality of the foregoing, the Agreement affords the Salt Lake City refinery product placement on a ratable pipeline cycle out of the refinery 12 months a year which is now disturbed due to Defendants' breach of the Agreement. Plaintiffs invested in the unused, forecasted throughput volume that Plaintiffs built into production, terminal throughput, pipeline space, and delivery planning, including trucking, for the Nevada Locations. Among other damages, Defendants' breach of the

Agreement disrupts optimized routes, creates excess product at terminals, forces underutilization of contracted-for transportation capacity in both trucks and pipe space, resulting in reduced throughput efficiency, increased or unnecessary pipeline fees, and increased production costs across Plaintiffs' refining operations.

48. Defendants' breach also caused Plaintiffs' loss of contractual exclusivity to supply all fifty-five (55) Nevada Locations with Motor Fuel Products and loss of brand placement at thirty (30) of those sites, loss of profits from sales of Plaintiffs' products including Motor Fuel Products at the Nevada Locations, and the disruption of throughput volumes including assurance of refinery outputs from its Salt Lake City and Los Angeles refineries, logistics and supply planning disruptions including contracts with third-parties with obligations extending beyond Defendants' breach, and damage to the goodwill and brand perception of Plaintiffs, all of which Plaintiffs invested in based on the MSTA and the Extended Term that Defendants have breached.

49. On November 17, 2014, before the Agreement was executed, Tesoro Refining & Marketing Company LLC, Tesoro Northstore Company, Tesoro South Coast Company, LLC, and Treasure Franchise Company, LLC (collectively, the "Guaranty Entities") and Sammer Anabi executed a Continuing Guaranty (the "Continuing Guaranty[1]"). Under the Continuing Guaranty, Sammer Anabi, in his individual capacity, unconditionally, fully, and irrevocably guaranteed the full payment and performance of AK, Inc.'s obligations to the Guaranty Entities.

50. The Continuing Guaranty defines "Obligation" to include all debt, payment, and performance obligations of AK, Inc. to the Guaranty Entities of any kind, whether existing or arising in the future and whether fixed or contingent, known or unknown, liquidated or

[1] Plaintiffs incorporate the Continuing Guaranty by reference. Plaintiffs have not included the Continuing Guaranty with this filing due to Defendants' designation of the Continuing Guaranty as confidential under the Confidentiality and Protective Order. Dkt. 51. Plaintiffs will provide the Continuing Guaranty as requested or as necessary according to the procedures in the Confidentiality and Protective Order and the rules.

unliquidated. The Continuing Guaranty permits the Guaranty Entities to demand performance or payment directly from Sammer Anabi, whose obligations are primary and unconditional and not merely those of a surety, without first pursuing AK, Inc. or exhausting any other remedy. *See* Continuing Guaranty at Sections 1 and 6.

51. Plaintiffs have demanded Sammer Anabi's performance under the Continuing Guaranty. He has neither caused AK, Inc.'s performance nor paid the amount demanded for AK, Inc.'s obligations under the Agreement, despite that such performance and/or such amount is an Obligation under the Continuing Guaranty which arose after Sammer Anabi's execution of the Continuing Guaranty. Accordingly, Sammer Anabi has breached the Continuing Guaranty.

## V. CLAIMS

### A. Declaratory Judgment (28 U.S.C. §§ 2201–2202; alternatively, Tex. Civ. Prac. & Rem. Code § 37.001 et seq.) (All Defendants)

52. Plaintiffs incorporate the preceding paragraphs by reference.

53. A present justiciable controversy exists between the parties that can fully and permanently be resolved by a declaratory judgment. The declaratory judgment sought would have the effect of terminating the controversy and resolving uncertainty in the parties' legal relations going forward.

54. Plaintiffs bring this claim primarily under the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and alternatively or supplementally under the Texas Declaratory Judgments Act. The Texas Declaratory Judgments Act authorizes courts to "declare rights, status, and other legal relations" under written contracts and to "settle and [] afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." Tex. Civ. Prac. & Rem. Code §§ 37.002–.003.

55. An actual controversy exists here concerning the interpretation and application of Sections 3 (Term), 23 (Notices), and 17.B (Assignment by Company) of the Agreement.

56. Plaintiffs seek declarations to resolve these disputes and clarify the parties' contractual rights.

57. First, Plaintiffs request a declaration that the November 20, 2023, letter constituted a valid written notice of exercise of the Option under Section 3 and unequivocally extended the Term for two (2) years. Section 3 requires written notice of exercise; it does not prescribe any particular form beyond simply providing written notice that the Option is being exercised. The Extension Notice expressly stated Plaintiffs' election to extend the Term and specified the extension period, satisfying the contractual requirement. Ex. A, Wilson Decl. Ex. A-3 ("Pursuant to Section 3 of the [Agreement], please take Notice that Company hereby elects to exercise the Option to extend the Term for an additional two (2) years.").

58. Second, Plaintiffs seek a declaration that such notice was sufficient under Section 23 and does not require Tesoro letterhead or any particular corporate form or signatory. Section 23 governs the manner of giving notices and permits delivery by written communication without imposing formalistic requirements such as letterhead or corporate seals. Texas courts enforce notice provisions according to their plain language and decline to impose conditions not found in the contract. *See URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 764 (Tex. 2018); *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 753 (Tex. 2006) (concluding that courts must enforce contracts as written and may not rewrite them under the guise of interpretation).

59. Third, Plaintiffs seek a declaration that the Agreement does not require separate notice of assignment to Operator or Landlords for Company's assignment or corporate succession. Section 17.B addresses assignment by Company and permits assignment without imposing an

additional notice obligation. Texas law presumes that parties intend the language they chose; courts will not imply duties that the contract omits. *See URI*, 543 S.W.3d at 764 (noting that courts should "presume parties intend what the words of their contract say").

60. Declaratory relief is necessary to resolve these disputes and prevent uncertainty that threatens ongoing contractual performance and related transactions. The federal Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, authorizes the requested relief, and the Texas Declaratory Judgments Act, Tex. Civ. Prac. & Rem. Code § 37.003(c), provides an alternative or supplemental basis. By granting these declarations, the Court will clarify the parties' rights under the Agreement and ensure compliance with applicable law.

61. Plaintiffs seek declarations confirming that the Extension Notice validly preserved all rights and obligations under the Agreement, including rent-related concessions and associated benefits. Plaintiffs further seek an award of reasonable attorney's fees and expenses as are equitable and just pursuant to Tex. Civ. Prac. & Rem. Code § 37.009.

**B. Breach of Contract (Against Operator and Landlords)**

62. Plaintiffs incorporate the foregoing allegations and assert a claim for breach of contract. Defendants' material breaches of the Agreement include without limitation:

i. Defendants' repudiation of the Agreement and refusal to honor Plaintiffs' valid extension violate the Agreement as a whole, including, without limitation, the Operator obligations under Section 6.B. Defendants' refusal and/or failure to perform their obligations under the Agreement, including the exclusive sale of Plaintiffs' products including Motor Fuel Products at the Nevada Locations, through the Extended Term constitutes a breach.

ii. Defendants' unilateral removal of Company's Identifications (as defined in the Agreement) from the Nevada Locations and/or any other location covered by the Agreement, without Company's authorization and in the absence of any Agreement provision permitting such conduct, is a direct and uncured material breach of the Agreement, including Sections 7.B and 16, beginning on or around May 4, 2026;

iii. Defendants' removal, transfer, sale, or other unauthorized disposition of Plaintiffs' products at the Nevada Locations, including the Motor Fuel Products from the underground storage tanks at the Nevada Locations, without a prior written agreement on price and terms consistent with the Agreement, constitutes conversion of Company's property and a breach of Section 2.Q of the Agreement, beginning on or around May 4, 2026;

iv. Defendants' May 1, 2026 notice satisfied none of Section 22's standards. Defendants have no termination right under Section 22. Even if Defendants had rights under Section 22, no individual Motor Fuel Facility can exit the Agreement in under twenty (20) days from initial written notice, and thirty (30) days' notice is required before any termination of the Agreement as a whole. Defendants' May 1, 2026 notice and subsequent unilateral de-branding violated Section 22. Plaintiffs further incurred damages as a result of Defendants' failure to provide timely notice of their planned de-branding of the Nevada Locations. Defendants knew, or reasonably should have known, that withholding such notice and immediately commencing de-branding activities would deprive Plaintiffs of a reasonable opportunity to protect their contractual and property interests.

v. Defendants' marketing and solicitation of negotiations with third parties concerning the rebranding of the same locations covered by the Agreement further breached the Agreement by interfering with Plaintiffs' rights during the Extended Term.

63. Plaintiffs fully performed all obligations or were excused from performance.

64. As a direct and proximate result of Defendants' breaches, Plaintiffs have suffered damages in an amount to be proven at trial, including loss of contractual rights, lost profits, exclusivity, and related economic harm.

65. Plaintiffs seek recovery of actual damages and attorney's fees pursuant to Tex. Civ. Prac. & Rem. Code § 38.001.

**C. Anticipatory Breach / Repudiation (Against Operator and Landlords)**

66. Plaintiffs incorporate the preceding paragraphs by reference.

67. Defendants' disregard of the Extended Term of the Agreement constitutes an anticipatory breach of obligations owed to Plaintiffs. Plaintiffs relied on the Extended Term in

structuring their lease concessions and financial commitments, including without limitation planning production runs at their Salt Lake City and Los Angeles Refineries.

68. Defendants have anticipatorily breached the Agreement. Defendants' express statements and conduct—including unilaterally removing agreed-upon branding from the Nevada Locations and engaging in third-party negotiations—constitute a clear and unequivocal repudiation of their contractual obligations under the Agreement's Extended Term.

69. Plaintiffs are entitled to treat this repudiation as a breach and seek damages for losses resulting from Defendants' refusal to perform.

70. As a direct and proximate result of Defendants' repudiation of the Agreement and the Extended Term, Plaintiffs have suffered damages in an amount to be proven at trial, including loss of contractual rights, exclusivity, and related economic harm. Plaintiffs seek recovery of actual damages and attorney's fees pursuant to relevant contractual provisions and/or Tex. Civ. Prac. & Rem. Code § 38.001.

**D. Breach of Contract / Breach of Guaranty (Sammer Anabi)**

71. Plaintiffs incorporate the preceding paragraphs by reference.

72. The Continuing Guaranty is a valid and enforceable agreement under which Sammer Anabi personally and unconditionally, fully, and irrevocably guaranteed the full payment and performance of AK, Inc.'s Obligation to the Guaranty Entities. The Continuing Guaranty's definition of "Obligation" is "all debt, payment, and performance obligations of [AK, Inc.] to [Guaranty Entities] of any kind now existing or hereafter arising, whether made directly to [the Guaranty Entities] or subsequently acquired by assignment or succession, fixed or contingent, known or unknown, liquidated or unliquidated, present, future, no matter how or when arising . . ." Section 1 reiterates that the Continuing Guaranty is a continuing guaranty of payment and

performance, not merely collection, and shall not be subject to any offset, defense, or counterclaim of AK, Inc. or Sammer Anabi.

73. AK, Inc.'s obligations under the Agreement qualify as an "Obligation" under the Continuing Guaranty, entitling Plaintiffs to demand performance or payment directly from Sammer Anabi per the terms of the Continuing Guaranty.

74. As described in detail in Counts B and C which are incorporated herein, AK, Inc. breached the Agreement.

75. Plaintiffs have made a demand for Sammer Anabi to cause AK, Inc.'s performance under the Agreement or for Sammer Anabi to pay the amount due from AK, Inc. under the Agreement in accordance with the Continuing Guaranty. Sammer Anabi has not caused AK, Inc.'s performance under the Agreement nor paid the amount demanded. Sammer Anabi has therefore breached the Continuing Guaranty.

76. Plaintiffs seek payment from Sammer Anabi for an Obligation under the Continuing Guaranty, namely AK, Inc.'s obligations under the Agreement. Plaintiffs also seek their attorney's fees incurred in connection with AK, Inc.'s breach of the Agreement and Sammer Anabi's breach of the Continuing Guaranty per the Continuing Guaranty's attorney's fees provision.

77. As a result of Sammer Anabi's failure to cause AK, Inc.'s performance under the Agreement or to pay the amount demanded in accordance with the Continuing Guaranty, Plaintiffs have suffered damages caused directly by such breach, including all damages flowing from the breach of the Agreement, for which Sammer Anabi is personally and unconditionally liable as guarantor, and damages flowing from Sammer Anabi's breach of the Continuing Guaranty.

78. Plaintiffs seek payment from Sammer Anabi for these damages, as well as attorney's fees incurred in connection with the breach of the Agreement and Sammer Anabi's breach of the Continuing Guaranty per relevant contractual provisions and/or Tex. Civ. Prac. & Rem. Code § 38.001, in amounts to be proven at trial.

**E. Conversion (Against Operator and Landlords)**

79. Plaintiffs incorporate the preceding paragraphs by reference.

80. Plaintiffs owned or had the right to immediate possession of its products at the Nevada Locations, including Motor Fuel Products. The Agreement is clear that all Motor Fuel Products remain the property of Plaintiffs until purchased by a retail customer.

81. Defendants wrongfully exercised dominion and control over the products including the Motor Fuel Products by removing, transferring, selling, or otherwise disposing of them without Plaintiffs' authorization and without a prior written agreement on price and terms.

82. Defendants' conduct constituted an unauthorized and unjustifiable assertion of dominion over Plaintiffs' property that was inconsistent with Plaintiffs' ownership rights.

83. As a result of Defendants' unauthorized exercise of dominion and control over Plaintiffs' products at the Nevada Locations including the Motor Fuel Products, Plaintiffs have been deprived of the value of those products and have suffered actual damages, including the value of the products wrongfully taken, removed, transferred, sold, or disposed of, together with any losses flowing from that deprivation.

84. Defendants' unauthorized taking of Plaintiffs' property was willful, knowing, and intentional, entitling Plaintiffs to recover exemplary damages in addition to actual damages, in amounts to be determined at trial.

**F. Unjust Enrichment (Against All Defendants, in the alternative)**

85. Plaintiffs incorporate the preceding paragraphs by reference.

86. In the alternative to Plaintiffs' breach-of-contract claims, Defendants have been unjustly enriched by continuing to operate the Nevada Locations and benefiting from Plaintiffs' fuel supply infrastructure, brand recognition, and operational systems while simultaneously repudiating the Agreement and refusing to honor Plaintiffs' contractual rights. Following the de-branding, Defendants continued to operate the Nevada Locations and sell motor fuel products from those locations, and have contracted with another supplier, benefiting from the infrastructure, customer base, and brand recognition that Plaintiffs built and maintained during the Agreement's term, without compensating Plaintiffs for the value of those unfairly retained benefits.

87. Defendants retained these benefits—including throughput compensation, brand-driven customer traffic, and rent concessions—without paying the consideration owed under the Extended Term. The value of these benefits, including the economic advantage conferred by Plaintiffs was substantial, and the retention of those benefits without compensation to Plaintiffs is inequitable and unjust.

88. Plaintiffs seek restitution of the value of the benefits retained by Defendants at Plaintiffs' expense, in amounts to be proven at trial.

### G. Tortious Interference with Existing Contract (Sammer Anabi and Rawa (Rene) Anabi)

89. Plaintiffs incorporate the preceding paragraphs by reference.

90. Sammer Anabi and Rawa (Rene) Anabi, acting in their individual capacities and through entities they control, intentionally interfered with Plaintiffs' existing contractual rights under the Agreement by directing AK and Rebel to repudiate and breach the Agreement, including by marketing and soliciting negotiations with third parties concerning rebranding and supply at the Nevada Locations.

91. Sammer Anabi and Rawa (Rene) Anabi's interference with Plaintiffs' rights undermined Plaintiffs' contractual and economic interests, including the benefit of the Agreement and Extended Term's exclusivity and long-term structure.

92. As a direct and proximate result of Defendants' interference, Plaintiffs suffered damages, including the loss of significant operational and logistical commitments based on the Extended Term—including refinery planning, fuel supply allocations, pipeline, trucking, and transportation contracts and fees, and inventory planning—disruption of the Salt Lake City refinery's ratable pipeline cycle product placement, excess product at terminals, underutilization of contracted-for transportation capacity in trucks and pipe space, loss of contractual exclusivity to supply all Nevada Locations with products including Motor Fuel Products, loss of brand placement and sales of products and Motor Fuel Products at the Nevada Locations, logistics and supply planning disruptions and additional costs including third-party contracts extending beyond Defendants' conduct, damage to the goodwill and brand perception of Plaintiffs, and lost profits.

93. As a direct and proximate result of the Anabis' willful, intentional, and unjustified interference, Plaintiffs suffered actual damages, including loss of exclusivity, lost profits, and disruption of contractual performance, in an amount to be determined at trial. Plaintiffs also seek recovery of exemplary damages in an amount to be determined at trial.

**H. Tortious Interference with Prospective Business Relations (All Defendants)**

94. Plaintiffs incorporate the preceding paragraphs by reference.

95. Defendants' wrongful conduct—including disparaging the validity of the Extension Notice and inducing third parties to disregard Plaintiffs' rights—disrupted Plaintiffs' ongoing and prospective business opportunities tied to the Agreement's validly extended term. Those opportunities included existing and prospective terminal contracts, pipeline contracts, agreements, and fees, trucking contracts, and fuel-supply arrangements that Plaintiffs had negotiated or were

negotiating in reliance on the Extended Term and the continued operation of the Nevada Locations. Defendants' conduct directly and proximately caused those arrangements to become unavailable, impaired, or economically burdensome and disrupted Plaintiffs' ability to secure and perform them resulting in damages to Plaintiffs including lost profits.

96. Defendants acted with knowledge and intent to harm Plaintiffs' economic interests or in reckless disregard for Plaintiffs' rights, including by disparaging the validity of the Extension Notice and inducing third parties to disregard Plaintiffs' rights, entitling Plaintiffs to recovery of both actual and exemplary damages under Texas law in amounts to be proven at trial.

**I. Promissory Estoppel (Operator and Landlords)**

97. Plaintiffs incorporate the preceding paragraphs by reference.

98. In the alternative, Plaintiffs assert a claim for promissory estoppel. Defendants repeatedly acknowledged and affirmed in writing—including in the January 8, 2024, email stating "We are excited about Marathon's extension of the [Agreement] and securing our operations … for the additional 2 years"—that the Agreement had been validly extended through January 31, 2028. These representations that the Agreement was extended were clear and unequivocal, and Defendants knew or should have known that Plaintiffs would rely on them.

99. Plaintiffs would not have made these commitments absent Defendants' repeated, affirmative representations that the Agreement was validly extended for two years. Defendants' repudiation of those assurances directly and proximately caused the damages described below.

100. Plaintiffs reasonably and foreseeably relied on these promises by, among other things:

i. Committing significant resources to maintain branding and supply infrastructure at the Nevada Locations; and

ii. Entering into related agreements and operational plans premised on the Extended Term.

101. Defendants' written acknowledgments of the Extension induced reliance by Plaintiffs.

102. This reliance, directly and proximately caused by Defendants' statements and conduct, was substantial, and was entirely foreseeable given the parties' long-standing relationship and the nature of the Agreement.

103. To avoid injustice, Defendants should be estopped from repudiating their prior assurances. Texas law recognizes promissory estoppel where (1) a promise was made, (2) the promisor should have expected reliance, (3) the promisee relied to its detriment, and (4) enforcement is necessary to prevent injustice. *Frost Crushed Stone Co. v. Odell Geer Constr. Co.,* 110 S.W.3d 41, 44 (Tex. App.—Waco 2002, no pet.); *Collins v. Walker*, 341 S.W.3d 570, 573–74 (Tex. App.—Houston 2011, no pet.).

104. Plaintiffs detrimentally relied on Defendants' representations of acceptance of the Extension Notice, including continued planning and operational support to maintain the Extended Term of the Agreement through January 2028. As a direct and proximate result of Defendants' refusal to honor their promises, statements, and conduct, Plaintiffs have suffered damages in an amount to be proven at trial, including: (i) Plaintiffs' reliance costs in the form of multi-million-dollar allocations for fuel supply, marketing, branding, and transportation and delivery agreements, including pipe space and trucking, terminal contracts, and fuel supply arrangements; (ii) excess inventory costs and underutilization of contracted-for transportation capacity, including truck and pipe space, and costs of transportation including increased or unnecessary pipeline fees, caused by the abrupt cessation of supply to the Nevada Locations at Defendants' demand; (iii) damage to Plaintiffs' goodwill and brand perception; and (iv) all other damages flowing from Plaintiffs' detrimental reliance on Defendants' assurances, in amounts to be determined by a jury.

## VI. CONDITIONS PRECEDENT

105. All conditions precedent to Plaintiffs' claims and requested relief have occurred, been performed, or have been excused.

## VII. JURY TRIAL

106. Plaintiffs demand a trial by jury and have paid the required jury fee as set by this Court.

## VIII. PRAYER

WHEREFORE, Plaintiffs Tesoro Refining & Marketing Company LLC and Marathon Petroleum Company LP respectfully request that the Court:

(a) Declare that the November 20, 2023 Extension Notice validly exercised the Option and extended the Agreement Term for two (2) years; that such notice was sufficient under Section 23; and that no separate or further notice was required under Section 17.B;

(b) Award Plaintiffs compensatory and exemplary damages for the claims asserted herein in an amount determined by the jury;

(c) Award Plaintiffs restitution against all Defendants for the value of the benefits retained through unjust enrichment;

(d) Award Plaintiffs their reasonable attorney's fees and costs under Tex. Civ. Prac. & Rem. Code §§ 37.009 and 38.001 and applicable contractual provisions; and

(e) Grant such other and further relief, at law or in equity, to which Plaintiffs may be justly entitled.

Dated: September 16, 2026

**NORTON ROSE FULBRIGHT US LLP**

*/s/ Aimeé Vidaurri*

Jeffrey A. Webb
State Bar No. 24053544
jeff.webb@nortonrosefulbright.com
Aimeé Vidaurri
State Bar No. 24098550
aimee.vidaurri@nortonrosefulbright.com
Hannah Hylbert
State Bar No. 24125790
hannah.hylbert@nortonrosefulbright.com
James M. Shultz
State Bar No. 24138804
jake.shultz@nortonrosefulbright.com
111 W. Houston Street, Suite 1800
San Antonio, Texas 78205
Telephone: (210) 224-5575
Facsimile: (210) 270-7205

*Attorneys for Plaintiffs Tesoro Refining & Marketing Company LLC and Marathon Petroleum Company LP*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 16, 2026, I electronically filed the foregoing First Amended Complaint with the Clerk of Court using the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Aimeé Vidaurri*
Aimeé Vidaurri